Good morning, your honor. May it please the court, Erin Koworkian on behalf of the appellant Xzavione Taylor. I would like to reserve two minutes for rebuttal today and I will watch my time. The Supreme Court in Rodriguez v. United States explained that officers may not conduct inquiries unrelated to the mission of a traffic stop unless undertaken in either of two situations. First, if done contemporaneously with the otherwise diligent furtherance of the mission of the traffic stop, or second, if these inquiries are independently supported by reasonable suspicion themselves. Here, however, neither of these situations were present and thus we ask this court to reverse the denial of Mr. Taylor's motion to suppress evidence. As to the first situation, officers repeatedly detoured from the mission of the traffic stop. Here... Let me just just just to pause because there's a sort of a series of events that happened here. Up until the time he was asked to be removed from the vehicle, do you contest anything up to that point? We do, your honor. Okay, how? Even from the outset of the encounter between Officer Gariano, the lead officer here, and Mr. Taylor, the first question posed to Mr. Taylor is whether there's weapons or drugs in the car. Weapons, perhaps, can go to negligent burdensome safety precaution for officers, but drugs, an inquiry into drugs, have no reasonable relation to either officer safety or the mission of this traffic stop. But even further, your honor... I mean, if that... Even assuming that's true, that would have prolonged the stop by a second to, you know, a few seconds to ask, are there any weapons or drugs in the vehicle? It may be only a few seconds at most, but the Supreme Court has been clear that for these off-mission tasks, there's no de minimis exception. So as this court explained in Landeros, building off of the Rodriguez decision, the question is not whether the amount of time that the detention is prolonged is reasonable, but it's whether any time at all was added to the stop. But even beyond this first question, your honor, there were repeated questions about weapons in the vehicle. And so the second question about whether there are weapons in the vehicle comes before Mr. Taylor. Can't that be asked? I mean, when you pull somebody over, can't you ask them, are there any weapons in the vehicle, just so the officer can know for his own or her own safety? And that was done at the outset of the stop, your honor. The problem is with repeated questioning, especially where, as here, Officer Gariano testified, that there was nothing of significance in Mr. Taylor's initial denial of weapons. Repeated questioning then becomes an inquiry into the separate investigation into evidence of criminality. Were most of those questions asked after he was out of the vehicle? You know, after they repeated the question a few times, and that was after he was out of the vehicle? The third question was after he was out of the vehicle. The second question was not. So it occurred at both points, your honor. And I would direct this Court to its decision Was the second question, it was in response to him saying that he was a felon, that he just got out on parole from being a felon in possession of a firearm? It came, yeah. It came after that. And so we have the quite It was your view that, what is your view if, I think they'd asked him, have you ever been arrested while he was still in the car? If they say, if somebody answers and says, yeah, I just got out for a felon in possession of a firearm, do you think for safety purposes you could ask again, you know, do you have a firearm in the car? I don't know how that changes. I submit to the Court that I don't think that that changes the posture of the case. I mean, they had already received an initial, an initial response from Mr. Taylor that for the officers raised no red flags. So after And I hear you on that. It's just that I would think that human nature would be as soon as you heard that somebody, you might, might ask again, even though I understand, I guess us sitting here, we'd be like, well, that's already been asked and answered. But it just seems like human nature. Oh, that's okay. You don't have a firearm, do you? You know, I think, I think this court in Landeros addressed an analogous question. Landeros explained in that case, it was, it wasn't, officers weren't searching for evidence of firearm, but they were asking a passenger for his identification in Landeros. And this court said that even assuming the first question would have been permissible, the officer's refusal to take the defendant's answer, no, that led to prolongation. So even if an initial question is justified as a, as a safety precaution, when we have these repeated questions, they don't share the same justification. They don't share the same basis. And I would also note for the court that at the point where we have this repeated questioning, it no longer becomes a negligibly burdensome precaution, right? Because at this point, we're having a, we're going further and further down a path towards investigating different, separate criminal activity, and we're taking time while doing that. So this is simply different in kind from the initial question upon, you know, as the Court noted, upon approach to the car, do you have any weapons in the car? Maybe that's a safety precaution. But once we're past that, and once there's nothing suspicious in Mr. Taylor's answer, well, then we're just on a fishing expedition. But there is something suspicious, right? The open red bag. At this point in time, our position is the officers don't, or at least Officer Gariano, the lead officer in this case, doesn't know about the open red bag. Well, just a second. I mean, I thought I saw in the videotape that you could see the red bag while he was still in the car. And then, then he gets out, and Gariano kind of looks and touches it to see if there's any gun in there, because as I understand it, he thinks that this is a common thing to do in the neighborhood, have one of these fanny packs over your shoulder to hold a gun. I don't think that you can actually see the bag in the body camera footage, Your Honor, until Mr. Taylor, until Officer Gariano instructs Mr. Taylor to exit the car. And then you can kind of see it flapping. What you can see in the video is you can kind of see a strap. A strap. A red strap. But there's nothing in the record to suggest that at that point, first of all, Officer Gariano knew that it was attached to this bag, or also to this bag that has... to step out of the vehicle under MIMS, right? Under a MIMS exit order, he could have. The problem in this case is that he was... Officer Gariano initiated the pat-down search by having Mr. Taylor step out of the car. And so MIMS is premised on this... MIMS is premised on a lawful detention. The problem in this case is that at the point where officers are no longer prosecuting the traffic stop, so they're detention at that point isn't lawful. It was already unlawful. Right. It's not related to... To go back to where you began on the request for weapons... Do you have weapons? I take your position to be when he pulled them over initially, he was entitled to at least ask one time, are there weapons in the vehicle? Do you agree with that? I think he could ask that at least once. Okay. So then the problem became he couldn't ask the second time? I think the problem... I think the problem is twofold. I think the first question actually is problematic because he asks about drugs with that same question. But it also is problematic because we have the repeated questioning about weapons in the car. We also have... I just want to make sure I understand the holding you would have this issue, which is basically, as I understand it, you're permitted to ask about weapons once. You're not permitted to ask a second time, even if somebody discloses that they're on parole for being a felon in possession. Well, I think the... I think... I think the court here is kind of going towards two separate points. So there's the initial question of whether it's related to the stop as a reasonable safety precaution. But if the court is asking whether reasonable suspicion as a result of Mr. Taylor disclosing that he's then on federal probation exists, that's a separate inquiry. And then we get into the totality of the circumstances at that point for whether reasonable suspicion existed. But reasonable suspicion isn't a requirement of kind of the threshold inquiry here, which was, was it related to the stop by virtue of being a safety precaution tied to the mission of the traffic stop? And that's where we say the repeated questioning is not reasonably related, or excuse me, is not related to that mission. Okay. Why don't we allow you two minutes for rebuttal? I know you'd asked for two. We kept you going a little bit. So we'll have, we'll put two minutes back on the clock when you come back. Thank you, Your Honor. Good morning. May it please the Court. Peter Walkingshaw on behalf of the United States. The touchstone of the Fourth Amendment is reasonableness. And in this case, officers came upon the defendant driving a car with no license plate in an area that they knew to be associated with shootings, robberies, and gang activity. After a brief conversation with the defendant, they learned that he had no identification on him, that he had multiple prior felony convictions, including one for illegal gun possession, and he was wearing an unusual accessory that they recognize as a place frequently used by people in the area to hide firearms. It was eminently reasonable for the officers in this case to suspect that this defendant had a gun, and they acted in a matter in compliance with the Fourth Amendment. Now, I'm happy to take questions for the Court. If I might start addressing why I think the defense position that the preliminary questions were unconstitutional, I believe that's wrongheaded. Now, and I believe this for two reasons. Now, the first is, as this Court recognized in Hilton, an officer has a need to understand what he is dealing with in a traffic stop because these interactions with the public are so dangerous to officers. As recognized by the Supreme Court in Marilyn v. Wilson said in our briefs, the danger in these interactions is not, it does not stem from the ordinary back and forth of a traffic stop. It stems from the danger that evidence of a more serious crime will be uncovered and that the suspect will use violence to prevent apprehension. Now, this is one area. The second area of concern, when asking a suspect questions, an officer is never really going to be able to know whether or not the answers are truthful. They're probing to try and get a sense of what they're dealing with. And I think this goes directly to Hilton's recognition that criminal history checks are not problematic under the Fourth Amendment, even though they don't really answer the question either of whether or not a defendant has contraband in a car or other reasons why they might be tempted to resist the officer's continued attention of them. I think this goes to the same question. So the defense objects to a reference to drugs, which, as Judge Brest noted, took no more than a second. It was sandwiched between are there any guns, drugs, or knives in the car, and then a brief return to the question later. And then I believe after Mr. Taylor volunteered that he was on parole, they didn't ask initially if he was. They asked if he was in compliance with those terms and conditions. And these sort of questions are essential because they go towards is this person that I'm dealing with, who I have very little information on to begin with, potentially worried about more serious consequences from this interaction? And if so — But that's the question about they know he's a felon, previously a felon in possession. Okay. If we didn't have the bag and that's all they know, does that give them reason to proceed to further questioning? Just — what does it do to the calculus to find out he's a felon in possession? Or previously? So taking Your Honor's — I want to make sure I understand Your Honor's question. So the felon in possession, I think, is a very important step in the calculus specific to this crime. What it tells the officers is, in the past, criminal penalties have not been enough to deter this defendant from possessing a gun when he knows he's not supposed to. And then I believe Your Honor was asking a question about the — I do — I was trying to separate it from that. Okay. So I — if Your Honor's asking about the fanny pack, I do think that's a very important part of the calculus. Yeah, I — perhaps. I was just wanting to know what — what — finding out that he was convicted of a felon — being a felon in possession, what does that change? At that point, what can they do? So I believe at that point — now, I suppose what I'll take as a question, if we take the defendant's position that the officer didn't know that the defendant had this bag strapped to the front of his chest, they certainly can order him out of the car. That's black-letter law from Pennsylvania v. MIMS, that that's a basic safety precaution for officer safety, because if a suspect is inside a car and given unrestricted access to the passenger compartment, that presents a danger to officers that things that they don't know are in there could be used against them. So while we vigorously contest the idea that the officer didn't see the fanny pack, he was standing no more than a foot or two — And he could order him out of the car regardless of whether he knew he was a felon in possession or the fanny pack. That's correct, Your Honor. So I can get — kind of goes to Judge O'Stein's question, which is, so what role do those things play in any of this, I guess? So while — so I — while the officer could certainly order him out of the car, I believe the — the felon in possession conviction and the fanny pack further support the frisk that the officers subsequently conducted and their request to search the car. I mean, if — this is seeming kind of questionable up to this point, when he hops out of the car and has this fanny pack dangling around his neck, I mean, is it your position that that is sort of the moment when the — the reasonable suspicion of a gun offense locks in, and at that point, the stop can be prolonged to figure out what's going on? I would say that it occurred as — earlier than that, because we do believe that the officers are aware of the fanny pack prior to that, but certainly at that point, Your Honor, we — it is our position that reasonable suspicion is locked in. I don't believe there's anything really in the record that the district court relied on or that we've advanced after that point that further advances reasonable suspicion of gun possession. I was — I was just kind of trying to figure out how these things are supposed to play out. If he gets a negative answer about the gun and he doesn't consent to any search, then the officers would let him get back in the car, which they haven't searched, and all they have is his answer that I don't have a gun today, basically. And then they're supposed to let him get back in the car? Yes, Your Honor. At that point — at that point, they would. Let me ask you, in California, if somebody is driving without a license and has no license plate, are they — is that a crime for which they can be arrested? Or was — oh, this was Nevada. Sorry. Wrong state. And, Your Honor, I apologize. I unfortunately don't have the answer to either of those questions. If I could take a step back briefly, I want to clarify my answer to Your Honor's previous question slightly. Okay. With reasonable suspicion under Terry v. Ohio, brief detention and no, further questioning of the suspect might have been — we honestly don't know what ultimately they could have, but they could have asked him more questions even if he said, you know, you can't search my car. Now, the extent or nature of that further questioning would be subject to a reasonableness analysis, but I just want to clarify that if he says, no, you can't search my car, that doesn't necessarily directly end the inquiry. I'm not sure that much further could have been done, but just to make sure I'm giving an accurate answer to Your Honor's question. One of the conditions — do you know if one of the conditions of his parole was that he had already pre-consented? Search condition, Your Honor? So the officers did not ask that in this question. I believe that is a — that's been an issue in some of the district court cases that have found that running a parole record search is problematic, that there's perhaps slightly more of a disconnect between officer safety and between officer safety and questions about parole violation. If the question is, can we search you without your consent, that doesn't really necessarily speak to officer safety concerns so much as, are you in violation of parole and therefore we might have to arrest you in a few moments. That, I think, much more clearly speaks to the potential of the interaction becoming fraught or more dangerous, if that makes sense. Did I answer Your Honor's question? I'm trying to think. I'm trying to think. I could see where the idea that if you have an empty fanny pack on you, why are you carrying an empty — I think it was unzipped, right? An empty, unzipped fanny pack. Seems like an ordinary person would think, I wonder if somebody just took a gun out of that or something like that. But, like, how far does that rationale reach? Like, if somebody's wearing an untucked shirt, do you think, well, that might be if they had been carrying a gun in their waistband or something? Yeah, I recognize Your Honor's concern. I will say that part of the reasonable suspicious calculus has to be, how unusual is the thing that the officer is looking at? And now, as far as articles of clothing go, I know the defense has taken the position that this is sort of a bag unlike any other. I don't think that's necessarily true for fanny packs. I think they're a pretty unusual accessory in this day and age. People wear things for one of two reasons, either form or function. I think it's pretty rare that people wear fanny packs as a fashion statement. It has a number of benefits in terms of — I don't know the record comments on the fashionability of the fanny pack, but I think the officers did say, in our experience, this is something that people use to carry guns. That's correct, Your Honor. And I think it was entirely appropriate for the It's over his shoulder, right? That's correct, Your Honor. He was worn kind of like a bandolier. The front of it was essentially — the zipper was essentially in the front by the chest. Yeah, correct, Your Honor. It was essentially sort of right — kind of where my tie is, effectively. I see him at time. I'm happy to answer any further questions, but if there's nothing else — It sounds like there's not, so thank you, sir. Thank you. Thank you. Your Honors, I'll go ahead and jump in with, I think, what may have been one of Judge Van Dyke's last questions, which was, you know, in talking about this fanny pack, it really was kind of more of a satchel, but we all called it a fanny pack in the court below. How far does that rationale reach in the reasonable suspicion analysis? And I'd submit to this court, it doesn't even reach this case. And I think that the primary problem in the reasonable suspicion analysis is here, even considering the fanny pack, and even although we challenge this factual finding, even considering the high crime finding in this case, is that the government's position and ultimately the district court's holding rely on broad generalizations about large segments of people in our society without accounting in the totality of circumstances for the specific particularized information that officers were learning as to Mr. Taylor. So even if I take the government's position to be that reasonable suspicion existed at the outset, even if that's true, throughout the course of this stop, officers learned a multitude of information affirmatively dissipating any otherwise existing reasonable suspicion here, and that's not something that the government has grappled with, either in its briefing or before the court today. So there's been no totality reconciliation of the fact that, you know, officers recognized he wasn't — he didn't appear threatening to them, no bulges in his clothing, he was cooperative, he didn't appear nervous. All of the factors that this court will consider to look to the particular person that's been seized to see if reasonable suspicion then supports the officer's actions are missing here. Something more is required, we submit to this court, for the fishing expedition that officers Gariano and Alvarado ultimately embarked on on this day. And because that something more is missing, we'd ask this court to reverse. Thank you. Thank you, counsel. I want to thank both counsel for the helpful briefing and arguments. This matter is submitted.
judges: BRESS, VANDYKE, Restani